W. EUGENE DAVIS and BENAVIDES, Circuit Judges:
The challenges raised in the present case require this court to decide whether certain provisions of the Federal Election Campaign Act (“FECA” or “the Act”) of 1971, 2 U.S.C. § 431 et seq.,[1] violate the *414 Plaintiffs’ right to free speech under the First Amendment. Applying Supreme Court precedent, we conclude that each of the challenged FECA provisions constitutes a constitutionally permissible regulation of political parties’ campaign contributions and coordinated expenditures. Accordingly, we find that none of the challenged provisions unconstitutionally infringe upon the rights of the Plaintiffs to engage in political debate and discussion.
I.
Plaintiff Anh “Joseph” Cao is the United States Representative for the Second Congressional District of Louisiana, and Plaintiff Republican National Committee (“RNC”) is the national political party committee of the Republican Party.[2] On November 13, 2008, just before the December 6, 2008 election, the Plaintiffs filed a suit for declaratory judgment,[3] asserting eight constitutional challenges to various provisions of FECA. Generally, the Plaintiffs challenge the statutory provisions limiting the RNC’s contributions to, and expenditures made in coordination with, Cao’s 2008 congressional campaign.
The district court, abiding by its proper role in addressing a 2 U.S.C. § 437h challenge,[4] identified the constitutional issues in the complaint, held evidentiary hearings concerning those issues, and made necessary findings of fact. See Khachaturian v. FEC, 980 F.2d 330, 332 (5th Cir.1992) (en banc). In doing so, the district court began by discussing the general contribution and expenditure limitations FECA places on political parties. Cao v. FEC, 688 F.Supp.2d 498, 508-17 (E.D.La.2010) (“Cao (District Court)”). Specifically examining how FECA affected the RNC’s contributions and expenditures related to the 2008 Cao campaign, the district court then found that the RNC spent all of the $42,100 it was allowed to spend on coordinated expenditures under the Party Expenditure Provision, 2 U.S.C. § 441a(d)(2)(3),[5] and reached its $5,000 *415 contribution limit under § 441a(a)(2)(A).[6] Id. at 532. Additionally, the district court found that the RNC would have spent additional money on speech expressly advocating the election of Cao had it been permitted to spend beyond FECA limitations. Id. at 532-33.
Upon hearing the evidence and making the necessary findings of fact, the district court evaluated the Plaintiffs’ eight constitutional challenges and, pursuant to § 437h, certified four questions to this en banc court. Id. at 549. The district court dismissed the Plaintiffs’ remaining four challenges as frivolous. Id. Subsequently, the Plaintiffs appealed the district court’s dismissal of the non-certified, frivolous questions. For purposes of judicial economy and efficiency, we consolidated the Plaintiffs’ appeal of the dismissal of the non-certified questions with the court’s en banc consideration of the certified questions.
We review the constitutionality of questions certified pursuant to § 437h de novo. See Goland v. United States, 903 F.2d 1247, 1252 (9th Cir.1990). We review the district court’s dismissal of the Plaintiffs’ remaining claims as frivolous for abuse of discretion. Id.
II.
This appeal requires us to address the intersection of congressional campaign finance reform with the fundamental right to free speech under the First Amendment. Since the landmark decision of Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court on a number of occasions has evaluated the limitations that the First Amendment imposes on the Government’s ability to preserve the integrity of the democratic election process through its regulation of campaign expenditures and contributions made to federal candidates. As such, many of the Plaintiffs’ constitutional challenges raise questions the Supreme Court has previously addressed. Thus, we begin our analysis with a brief examination of the constitutional contours in which we find ourselves. In Buckley, the Supreme Court determined that FECA’s “contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities.” Id. at 14, 96 S.Ct. 612. The Buckley Court declared that the “[djiscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution.” Id. As a result, the Buckley Court applied a strict level of scrutiny to the Government’s restrictions “on the amount of money a person or group can spend on political communication during a campaign [since such restrictions] necessarily reduce] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.” Id. at 19, 96 5.Ct. 612.
*416 Although the Buckley Court recognized that FECA’s limitations implicate important First Amendment concerns, the Supreme Court’s application of strict scrutiny did not result in the invalidation of all of FECA’s regulations. See id. at 19-21, 96 S.Ct. 612. Instead, the Buckley Court determined that some governmental intrusions on an individual’s (or political party’s) First Amendment right to make financial contributions to a candidate’s campaign were warranted based on the Government’s compelling interest to prevent corruption in the election of federal officials. Id. at 20-21, 26-27, 96 S.Ct. 612. The Court reasoned that:
To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined. Athough the scope of such pernicious practices can never be reliably ascertained, the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one.
Id. at 26-27, 96 S.Ct. 612.[7] The Buckley Court recognized that FECA’s contribution limits were Congress’ response to the rising levels of corruption in the election of public officials. Id. at 26, 96 S.Ct. 612. Consequently, the Court found that the governmental interest in preserving the integrity of our democratic system was paramount. Id. at 27, 96 S.Ct. 612.
In addition to articulating the compelling governmental interest for FECA’s limitations on campaign contributions, the Buckley Court also articulated the constitutional distinction between FECA’s regulations of contributions and expenditures, concluding that courts must apply a greater degree of constitutional scrutiny to FECA’s regulations of expenditures. See id. at 23, 96 S.Ct. 612. The Court determined that FECA’s regulations on expenditures placed greater restrictions on First Amendment rights because they “represent[ed] substantial rather than merely theoretical restraints on the quantity and diversity of political speech,” and consequently, the Court applied a more exacting degree of constitutional scrutiny to expenditure limitations. Id. at 19, 47-48, 96 S.Ct. 612. The Court further distinguished the Government’s regulation of contributions from its regulation of expenditures, reasoning that “[b]y contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor’s ability to engage in free communication.” Id. at 20, 96 S.Ct. 612. Accordingly, the Buckley Court recognized that the level of constitutional scrutiny for contribution limitations was less than the level of constitution scrutiny applied to limitations on expenditures. See id. at 29, 35, 38, 96 S.Ct. 612.
In further articulating the constitutional distinction between contributions and expenditures, the Court carefully distinguished independent expenditures from those expenditures that are “prearranged or coordinated” with a particular candidate. Id. at 46-47, 96 S.Ct. 612. Following the terminology used in FECA, the Buckley Court considered that for purposes of First Amendment scrutiny, “prearranged or coordinated expenditures” are constitutionally equivalent to contributions. Id. at 46, 96 S.Ct. 612. According to the Court, it followed that coordinated expenditures are subject to the same limitations *417 and scrutiny that apply to contributions. Id. at 47, 96 S.Ct. 612. Although the facts of the challenge and nature of the Court’s analysis in Buckley gave the Court no reason to specifically address the level of scrutiny for coordinated expenditures, the Buckley Court implicitly recognized that limitations on coordinated expenditures would be, like contribution limitations, subject to a lower level of constitutional scrutiny than limitations on independent expenditures.
The Buckley Court’s distinction between coordinated expenditures (or contributions) and independent expenditures was reaffirmed in California Medical Ass’n v. FEC, 453 U.S. 182, 195, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981), when the Court explained that “[t]he type of expenditures that this Court in Buckley considered constitutionally protected were those made independently by a candidate, individual, or group in order to engage directly in political speech.” Id. (citation omitted) (emphasis added). In cases thereafter, the Court continued to recognize the distinction between a speaker’s First Amendment right to make independent versus coordinated expenditures, and the degree to which lower courts must balance these rights with the Government’s compelling interest to prevent corruption in the democratic elections of our public officials. E.g., Colorado Republican Fed. Campaign Comm. v. FEC, 518 U.S. 604, 613, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (“Colorado /”); FEC v. Colorado Republican Fed. Campaign Comm., 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (“Colorado IF).
With this legal landscape in mind, we begin our examination of the Plaintiffs’ constitutional challenges by first examining the questions the district court found to be frivolous.
A. Frivolous Questions
1.
The district court did not certify the Plaintiffs’ second and fifth questions in their complaint, which raise clearly related issues. Cao (District Court), 688 F.Supp.2d at 535-39. The Plaintiffs’ second question reads as follows:
Do the Party Expenditure Provision limits at 2 U.S.C. § 441a(d)(2)(3) violate the First and Fifth Amendment rights of one or more plaintiffs in that they are excessively vague, overbroad, and beyond the authority of Congress to regulate elections as applied to coordinated expenditures other than (a) communications containing express advocacy, (b) targeted federal election activity, (c) disbursements equivalent to paying a candidate’s bills, and (d) distributing a candidate’s campaign literature?
Id. at 504. The Plaintiffs’ fifth question reads as follows:
Do the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) and the Coordinated Contribution Provision at 2 U.S.C. § 441a(a)(7)(B)(i) (treating coordinated expenditures as in-kind “contributions”) violate the First and Fifth Amendment rights of one or more of the plaintiffs in that they are excessively vague, over-broad, and beyond the authority of Congress to regulate elections as applied to coordinated expenditures other than (a) communications containing express advocacy, (b) targeted federal election activity, (c) disbursements equivalent to paying a candidate’s bills, and (d) distributing a candidate’s campaign literature?

Id.

The Plaintiffs assert that §§ 441a(d)(2)(3), 441a(a)(2)(A), and *418 441a(a)(7)(B)(i)[8] reach speech that is not “unambiguously campaign related,” and therefore, the provisions are overbroad and vague in violation of the Supreme Court’s decision in Buckley. See Buckley, 424 U.S. at 81, 96 S.Ct. 612. We do not agree.
FECA must be read in light of the FEC regulations that implement the statute. Expenditures for a “party coordinated communication,” as defined by 11 C.F.R. § 109.37, are restricted to those which qualify as coordinated expenditures that may be regulated under the Constitution as contributions. In other words, the FEC regulations make it clear that a “party coordinated communication” only encompasses speech that is campaign-related.[9] Thus, § 109.37 limits the breadth of communications to which §§ 441a(d)(2)(3), 441a(a)(2)(A), and 441a(a)(7)(B)(i) apply. Therefore, the Plaintiffs’ argument that these statutory provisions reach speech that is not campaign-related is without merit. Buckley does not permit non-campaign-related speech to be regulated.
In Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court, invoking constitutional avoidance, construed FECA’s limitation on expenditures to apply only to funding of commu-nieations that “express[ly] ... advocate the election or defeat of a clearly identified candidate for federal office,” i.e., those that contain phrases such as “ ‘vote for,’ ‘elect,’ ‘support,’ ‘cast your ballot for,’ ‘Smith for Congress,’ ‘vote against,’ ‘defeat,’ [or] ‘reject.’ ” Id. at 43-44 & n. 52, 96 S.Ct. 612.
Shays v. FEC, 528 F.3d 914, 917 (D.C.Cir. 2008). The FEC regulations make abundantly clear that the only coordinated expenditures captured by the statutory reach of FECA are campaign-related expenditures which Buckley recognized that Congress could regulate as contributions.
Plaintiffs argued to the district court that the FEC’s promulgation of the above regulation constitutes an acknowledgment that some line exists between speech which may be regulated and speech which may not be regulated. See Cao (District Court), 688 F.Supp.2d at 536. This acknowledgment, Plaintiffs argued, “demonstrates a constitutionally deficient ambiguity in the current statutory language.” Id. We know of no authority, and Plaintiffs cite to no authority, that requires the content of FEC regulations be included in statute or that prohibits a statute’s reach to be narrowed by regulations. Accordingly, we find that the district court did *419 not abuse its discretion in denying the certification of the Plaintiffs’ second and fifth questions.
2.
The district court also found the Plaintiffs’ fourth question frivolous and denied its certification. Cao (District Court), 688 F.Supp.2d at 542-43. The Plaintiffs’ fourth constitutional challenge reads as follows:
Do the limits on coordinated expenditures at 2 U.S.C. § 441a(d)(3) violate the First Amendment rights of one or more plaintiffs? (a) Do all but the highest limits violate such rights because any lower rates are unsupported by the necessary anti-corruption interest? (b) Is 2 U.S.C. § 441a(d)(3) facially unconstitutional because lower rates cannot be severed from higher rates and the voting-age-population formula is substantially overbroad and inherently unconstitutional? (c) Is the highest limit for expenditures coordinated with Representatives unconstitutionally low?
Id. at 504.
The Plaintiffs argue that the multiple limits contained in § 441a(d)(3) mean that the Congress acknowledges that the higher limits are sufficient to accommodate any interest in preventing corruption, and thus the lower limits are automatically unnecessary to advance that anti-corruption interest.[10] This argument leads the Plaintiffs to conclude that any lower limits within a multiple-limit scheme are inherently unconstitutional.
The Supreme Court rejected this argument in Buckley when the Court declared that “Congress’ failure to engage in such fine tuning does not invalidate the legislation.” Buckley, 424 U.S. at 30, 96 S.Ct. 612. Although there may be variances within a statute’s limitations on contributions or expenditures, so long as the Government can establish “that some limit ... is necessary, a court has no scalpel to probe ....” or parse through the varying degrees of limitations. Id. (quotations and citations omitted). “In practice, the legislature is better equipped to make such empirical judgments, as legislators have [the] ‘particular expertise’” necessary to assess what limits will adequately prevent corruption in the democratic election of their peers. Randall v. Sorrell, 548 U.S. 230, 248, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006).
Plaintiffs also assert that § 441a(d)(3) is unconstitutional because the limitations imposed on contributions to different candidates vary depending on the voting age population in their respective districts. This challenge is similarly frivolous as it is foreclosed by Nixon v. Shrink Missouri Government PAG, 528 U.S. 377, 382, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), in which the Court upheld the constitutionality of a “statute impos[ing] contribution limits ranging from $250 to $1,000, depending on specified state office or size of constituency.”
Finally, in regards to the Plaintiffs’ challenge that the highest limit for expenditures coordinated with Representatives is unconstitutionally low, the Plaintiffs have failed to provide the court with any evidence upon which we could conclude that the limits impose too stringent of a burden on political speech. See Buckley, *420 424 U.S. at 21, 96 S.Ct. 612 (explaining that whether a contribution limitation is unconstitutionally low in part depends on whether the limitation prevents the candidate from “amassing the resources necessary for effective [campaign] advocacy .... ”); see also Khachaturian, 980 F.2d at 331 (“To present a colorable constitutional question in [an] as applied challenge, [the Plaintiff] must demonstrate that the [Act’s] limit had a serious adverse effect on the initiation and scope of his candidacy.”). Thus, in arguing that the challenged limits are unconstitutionally low, the Plaintiffs have failed to provide evidence demonstrating that the limits preclude federal candidates from effectively amassing the resources necessary to wage an effective campaign.[11]
Consequently, we find that the district court did not abuse its discretion in finding the Plaintiffs’ fourth question frivolous.
3.
Although the district court certified question 8(a), it found 8(b) and 8(c) to be frivolous. Plaintiffs offer no argument or authority in their briefs to assert that the district court erred in dismissing question 8(b). “When an appellant fails to advance arguments in the body of its brief in support of an issue it has raised on appeal, we consider such issues abandoned.” Justiss Oil Co., Inc. v. Kerr-McGee Refining Corp., 75 F.3d 1057, 1067 (5th Cir.1996). Accordingly, we find the Plaintiffs have waived their appeal of question 8(b).
The Plaintiffs’ eighth question in 8(c) states:
Does the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) facially violate the First Amendment rights of one or more plaintiffs [because] ... (c) [t]he limit is simply too low to allow political parties to fulfill their historic and important role in our democratic republic?
Cao (District Court), 688 F.Supp.2d at 504.
The Plaintiffs contend that § 441a(a)(2)(A)’s $5,000 contribution limitation is unconstitutionally low because it prohibits political parties from fulfilling their historic role in “our democratic republic.” While the Plaintiffs offer powerful rhetoric in support of this position, the record does not support the rhetoric. As the district court found, during the 200708 election cycle, the national parties raised more money than they raised in the election cycles before the effective date of the BCRA when the parties were also able to raise “soft” money, i.e. money that was not subject to the limitation or prohibitions of FECA. See Cao (District Court), 688 F.Supp.2d at 517.[12] Because Plaintiffs evidence failed to support their argument, the district court did not abuse its discretion in concluding that subsection (c) of the Plaintiffs’ eighth question is frivolous.
B. Certified Questions
Having found the district court did not abuse its discretion in finding the above *421 questions frivolous, we now turn to the questions certified to the en banc court.
1.
The district court certified the first constitutional question as follows:
Has each of the plaintiffs alleged sufficient injury to constitutional rights enumerated in the following questions to create a constitutional “case or controversy” within the'judicial power of Article III?
Cao (District Court), 688 F.Supp.2d at 504.
 As the Supreme Court observed, “[a] party seeking to invoke § 437h must have standing to raise the constitutional claim.” California Med. Ass’n, 453 U.S. at 193 n. 14, 101 S.Ct. 2712. This requires us to decide “whether appellants have the ‘personal stake in the outcome of the controversy’ necessary to meet the requirements of Art. III.” Buckley, 424 U.S. at 11, 96 S.Ct. 612 (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). “Standing requires, at a minimum, three elements: injury in fact, a ‘fairly traceable’ causal link between that injury and the defendant’s conduct, and the likelihood that the injury will be ‘redressed by a favorable decision.’ ” Cadle Co. v. Neubauer, 562 F.3d 369, 371 (5th Cir.2009) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).
In the present case, the Plaintiffs have met their Article III burden. First, the complaint alleges an injury that is concrete, not hypothetical. The complaint establishes that the RNC spent all of its $42,100 in expenditures on Cao’s election campaign allotted under the Party Expenditure Provision and reached its $5,000 contribution limit. Furthermore, the complaint alleges that during the course of Cao’s campaign, the RNC wanted to make additional expenditures, and but for the $42,100 Party Expenditure Provision making it illegal to do so, the RNC would have made these expenditures. This injury is not conjectural, but rather, is sufficiently concrete to satisfy the requirements of Article III.
Moreover, the Plaintiffs’ alleged injury is fairly traceable to the FEC’s conduct, as it is the FEC’s implementation of the Act and its regulations that render the Plaintiffs’ desired speech illegal. The Plaintiffs also satisfy Lujan’s third requirement, re-dressability, since a favorable ruling by this en banc court would permit the Plaintiffs to make further monetary contributions and carry out their desired coordinated speech acts — without any fear that the Government would regulate their coordinated expenditures pursuant to FECA.
Therefore, Plaintiffs have demonstrated sufficient Article III standing to bring their constitutional claims.
2.
The district court certified the third question as follows:
Does the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) violate the First Amendment rights of one or more plaintiffs as applied to a political party’s in-kind and direct contributions because it imposes the same limits on parties as on political action committees?
Cao (District Court), 688 F.Supp.2d at 504.
In the third certified question, the Plaintiffs claim that § 441a(a)(2)(A)’s limitation violates the First Amendment because it imposes the same contribution limitations on parties as it does on political action committees (“PACs”). The Plaintiffs raise three arguments in support of this proposition: first, that the Supreme Court’s decisions in Buckley and Colorado I support the notion that political parties’ political *422 speech deserves a higher degree of protection than the political speech of PACs; second, that the $5,000 contribution limitation violates Randall; and third, that the Supreme Court’s decision in Citizens United v. FEC, — U.S. -, 130 S.Ct. 876, 899, — L.Ed.2d-(2010), should alter the analysis of contribution limits FECA places on political parties and PACs. These arguments are without merit.
First, the Plaintiffs misconstrue the principal holdings in Buckley and Colorado I. Although the Court in both Buckley and Colorado I acknowledged the important historic role that political parties have played in the democratic election of this Nation’s public officials, the Court simultaneously acknowledged that it is this precise role that political parties fill that gives rise to the Government’s compelling interest in regulating their coordinated expenditures and contributions. Notably, the Colorado II Court effectively rejected the argument Plaintiffs now make, reasoning that:
The Party’s arguments for being treated differently from other political actors subject to limitation on political spending under the Act do not pan out .... In reality, parties ... function for the benefit of donors whose object is to place candidates under obligation, a fact that parties cannot escape. Indeed, parties’ capacity to concentrate power to elect is the very capacity that apparently opens them to exploitation as channels for circumventing contribution and coordinated spending limits binding on other political players.
Colorado II, 533 U.S. at 455, 121 S.Ct. 2351. Thus, to the extent that the Plaintiffs attempt to argue that Buckley and Colorado I support the proposition that the Government cannot place the same restrictive contribution limitations on political parties that it places on PACs, that argument is foreclosed by Colorado II— where the Supreme Court’s analysis fully supports the Government’s differential treatment of political parties — because of what Colorado II recognized as a political party’s unique susceptibility to corruption.
Second, the Plaintiffs misread Randall when they argue that the Court’s decision turned on the fact that PACs and political parties were treated equally. In Randall, the Court struck down the State of Vermont’s Act 64 requiring “that political parties abide by exactly the same low contribution limits that apply to other contributors,” 548 U.S. at 256, 126 S.Ct. 2479, because the contribution limitations were “suspiciously low” and would seriously impair political parties’ ability to effectively participate in the political process. Id. at 257, 261, 126 S.Ct. 2479. In the present case, FECA does not impose a “suspiciously low” limitation on a political party’s contribution, but rather, affords a more reasonable limitation of $5,000.[13] Consequently, the Supreme Court’s invalidation of Act 64 in Randall is entirely inapposite to the present constitutional challenge, and therefore does not support Plaintiffs’ challenge to § 441a(a)(2)(A).
Third, we do not read Citizens United as changing how this court should evaluate contribution limits on political parties and PACs. In Citizens United, the Court held that corporations and labor unions had the *423 right under the First Amendment to make independent campaign expenditures. 130 S.Ct. at 913. This conclusion that independent expenditures may not be restricted has been the rule for political parties since Colorado I. See Colorado II, 533 U.S. at 455, 121 S.Ct. 2351 (“[U]nder Colorado I, [a political party has had the ability] to spend money in support of a candidate without legal limit so long as it spends independently. A party may spend independently every cent it can raise wherever it thinks its candidate will shine, on every subject and any viewpoint.”).[14] Thus, the Supreme Court’s decision in Citizens United — -regarding a corporation’s right to make independent expenditures — provides no reason to change our analysis of the validity of the contribution limits FECA places on political parties and PACs. For the above reasons, we find that § 441a(a)(2)(A)’s $5,000 contribution limitation is constitutional. The fact that the Government’s “closely drawn” contribution limitation applies equally to both political parties and PACs is of no constitutional moment.
3.
The district court certified the fourth question as follows:
Does the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) facially violate the First Amendment rights of one or more plaintiffs because it is not adjusted for inflation?
Cao {District Court), 688 F.Supp.2d at 504.
In fashioning their argument that the $5,000 contribution limit is unconstitutional because it is not adjusted for inflation, the Plaintiffs rely heavily on the Supreme Court’s decision in Randall v. Sorrell. While the failure to index for inflation was one reason the Court struck down Vermont’s contribution limitation, the Randall Court reasoned that “[a] failure to index limits means that limits which are already suspiciously low ... will almost inevitably become too low over time.” 548 U.S. at 261, 126 S.Ct. 2479. The Court’s statement does not, in turn, mean that all contribution limits not indexed for inflation are automatically “suspiciously low” and unconstitutional. In the present case, FECA’s $5,000 limitation in § 441a(a)(2)(A) is not comparable to Vermont’s $200$400 limitation. Consequently, we are not presented with circumstances in which the failure to index for inflation is coupled with a contribution limitation so “suspiciously low” that it warrants this court’s judicial supervision to prevent the limitation from becoming “too low over time.”
Furthermore, the Plaintiffs’ argument that this court should invalidate § 441a(a)(2)(A) based on its failure to index for inflation alone overlooks the Supreme Court’s decision in Buckley, where the Court recognized that “Congress’ failure to engage in such fine tuning does not invalidate the legislation.” Buckley, 424 U.S. at 30, 96 S.Ct. 612.[15] So long as the Government can establish “that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000.” Id. (quotations and citations omitted). As this Court does not possess the “particular expertise” attributable to legislators who are “better equipped to make such empirical judgments,” we decline the opportunity to “determine with any degree of exacti *424 tude the precise restriction necessary to carry out the statute’s legitimate objectives.” Randall, 548 U.S. at 248, 126 S.Ct. 2479.
Accordingly, we find § 441a(a)(2)(A)’s $5,000 contribution limitation survives the Plaintiffs’ constitutional challenge presented in the fourth certified question.
III.
The only remaining question requires a more detailed discussion. The second question certified to the en banc court asks:
Do the expenditure and contribution limits and contribution provision in 2 U.S.C. §§ 441a(a)(23), 441a(a)(2)(A), and 441 a(a)(7)(B)(i) violate the First Amendment rights of one or more of [the] plaintiffs as applied to coordinated communications that convey the basis for the expressed support?
Cao (District Court), 688 F.Supp.2d at 504.
This question arose out of the RNC’s desire to spend in excess of the amount allowed for coordinated campaign expenditures under the Party Expenditure Provision. Particularly, the RNC wanted to expend its funds to run a radio advertisement in support of Cao (hereinafter “the Cao ad”). The proposed Cao ad said:
Why We Support Cao
The Republican National Committee has long stood for certain core principles, which we believe are the fundamentals of good government. When it comes to the issues of lower taxes, individual freedoms and a strong national defense, we need leaders who will stand with the American people and defend those issues.
We need leaders who understand that our economy is in a recession, our individual freedoms are constantly under attack and we continue to fight the global war on terrorism to keep our families safe.
Joseph Cao understands and fights for those issues. And, that is why we ask you to join us in supporting him on December 6. It’s important for Louisiana and important for the country.
Id. at 532. The RNC wanted to coordinate with the Cao campaign as to the “best timing” for the Cao ad. See Joint Stipulation of Fact ¶ 32. However, as the RNC readily admitted at oral argument before the en banc court and its 28(j) letter to the court, the RNC’s involvement with the Cao campaign amounted to coordination,[16] and the RNC already had spent the entire amount it was allowed to spend on coordinated campaign expenditures under FECA. Therefore, the RNC concluded that it could not coordinate with the Cao campaign to run the Cao ad without violat *425 ing FECA. Ultimately, the RNC chose to not expend its funds to air the Cao ad and brought this challenge to FECA’s restrictions on coordinated expenditures.
Because we are a court of error and only decide issues the parties bring to us, it is important at the outset to identify the RNC’s sole argument on this certified question. See Sherman v. United States, 356 U.S. 369, 376, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (“We do not ordinarily decide issues not presented by the parties .... ”). The RNC argues and only argues that §§ 441a(d)(2)(3), 441a(a)(2)(A), and 441a(a)(7)(B)(i) violate its First Amendment rights because the provisions regulate the RNCs “own speech.” The RNC asserts that its own speech may not be regulated, regardless of whether the speech is coordinated.[17] “Own speech” is defined by the RNC as speech that is “attributable” to the RNC and includes speech the candidate writes and decides how the speech is to be disseminated. In other words, the RNC argues that speech it adopts is attributed to it and therefore exempt from regulation regardless of the extent of coordination with the candidate.
With respect to this certified issue, the broad “own speech” argument is the only argument the RNC raised in its complaint,[18] the only argument the district court addressed,[19] the only argument the RNC raised in its briefs to the en banc court,[20] and the only argument the RNC’s counsel was willing to make at oral argument before the en banc court. In response to friendly questions from the en banc bench, the RNC’s counsel declined the opportunity to argue that the level of involvement between the RNC and the candidate with respect to the Cao ad did not amount to coordination. More broadly stated, counsel for the RNC refused to adopt the position that the level of coordination should affect whether an expenditure may be regulated. Instead, counsel steadfastly insisted that the proposed expenditure was coordinated and that his sole argument was that Congress could not regulate the RNC’s “own speech.” For example, the following exchange occurred at oral argument:
Judge Jolly: ... [Y]our own argument is that as long as it is your speech, there are no further concerns about it. Is that ...
Plaintiffs’ Counsel: That is correct.
Judge Jolly: But, on the other hand, you have admitted also that if you run it and it becomes, you run it so often and so much and with such degree of coordination that it becomes their speech.
Plaintiffs’ Counsel: No, the degree of coordination does not affect whose speech it is at all.
*426 Judge Jolly: In other words, you can sit down and discuss with them the degree of coordination on fifty ads, and you can keep running that ad and running that ad on their time, and it, and you are running a number of ads, and it still is your speech notwithstanding the “Nth” degree of coordination that you have in running them?
Plaintiffs’ Counsel: That’s right. There is no degree of being pregnant. You’re either or not.
Thus the record unambiguously reflects that the RNC’s sole challenge in this case with regard to the Cao ad is whether Congress may regulate a party’s own speech, meaning speech that is paid for by the party and adopted by the party regardless of coordination with the candidate. We therefore examine only that argument.
To evaluate the merit of the Plaintiffs’ expansive “own speech” argument, we return to Buckley v. Valeo, the first case to discuss coordinated expenditures under FECA. In Buckley, the Supreme Court examined, inter alia, then-18 U.S.C. § 608(e)(1) which limited individuals’ ability to make independent expenditures.[21] 424 U.S. at 39-51, 96 S.Ct. 612. The Government argued that Congress could restrict independent expenditures because independent expenditures could be used to circumvent contribution limits. The Buckley Court rejected the Government’s argument. In finding that independent expenditures could not be regulated, the Court compared § 608(e)(1) with § 608(b), the provision that regulated expenditures coordinated with a candidate. The Buckley Court stated:
... [CJontrolled or coordinated expenditures are treated as contributions rather than expenditures under the Act. Section 608(b)’s contribution ceilings rather than § 608(e)(l)’s independent expenditure limitation prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions. By contrast, § 608(e)(1) limits expenditures for express advocacy of candidates made totally independently of the candidate and his campaign. Unlike contributions, such independent expenditures may well provide little assistance to the candidate’s campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.
Id. at 46^47, 96 S.Ct. 612 (footnote omitted). Thus, the Buckley Court concluded that although Congress was unable to regulate individuals’ independent expenditures, Congress could regulate individuals’ coordinated expenditures.
Building on and embracing its analysis in Buckley, the Court in Colorado I and Colorado II further examined the limitations on coordinated and independent expenditures as applied to political parties. In Colorado I, the Colorado Republican Party (“CRP”) brought an as-applied challenge to the Party Expenditure Provision arguing that restricting a party’s independent expenditures was unconstitutional. The Colorado I Court followed the Buckley rationale and found that “the constitutionally significant fact ... is the lack of coordination between the candidate and the source of the expenditure.” Colorado *427 I, 518 U.S. at 617, 116 S.Ct. 2309. In holding that the restraint on an independent expenditure was unconstitutional, the Court distinguished between coordinated expenditures and independent expenditures, stating:
... [T]he Court’s cases have found a “fundamental constitutional difference between money spent to advertise one’s views independently of the candidate’s campaign and money contributed to the candidate to be spent on his campaign.” ... [Reasonable contribution limits directly and materially advance the Government’s interest in preventing exchanges of large financial contributions for political favors.
... [Limitations on independent expenditures are less directly related to preventing corruption, since “the absence of prearrangement and coordination of an expenditure with the candidate ... not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.”
Id. at 614-16, 116 S.Ct. 2309 (citations omitted). Thus, the Colorado I Court found that the Party Expenditure Provision was unconstitutional as applied to the CRP’s independent expenditures.
In Colorado I, the CRP also raised a facial challenge to the application of the Party Expenditure Provision to coordinated expenditures. Id. at 623, 116 S.Ct. 2309. The Colorado I Court remanded this facial challenge because the lower courts had not considered the issue. Id. at 625, 116 S.Ct. 2309. The remanded issue of whether Congress could restrict coordinated expenditures reached the Supreme Court five years later as Colorado II. After analyzing its precedents in Buckley and Colorado I, the Colorado II Court found that “a party’s coordinated expenditures, unlike expenditures truly independent, may be restricted to minimize circumvention of contribution limits.” 533 U.S. at 465, 121 S.Ct. 2351. In examining whether coordinated expenditures could be restricted, the Court applied the intermediate scrutiny standard announced in Buckley: the restriction must be closely drawn to match a important government interest. Id. at 456, 121 S.Ct. 2351. The Court found that Congress could regulate coordinated expenditures as contributions because of the sufficiently important governmental interest in preventing the potential for political corruption by circumvention of campaign finance laws. Id. at 459-60, 121 S.Ct. 2351. The Court stated:
There is no significant functional difference between a party’s coordinated expenditure and a direct party contribution to the candidate, and there is good reason to expect that a party’s right of unlimited coordinated spending would attract increased contributions to parties to finance exactly that kind of spending. Coordinated expenditures of money donated to a party are tailor-made to undermine contribution limits. Therefore the choice here is not, as in Buckley and Colorado I, between a limit on pure contributions and pure expenditures. The choice is between limiting contributions and limiting expenditures whose special value as expenditures is also the source of their power to corrupt. Congress is entitled to its choice.
Id. at 464-65, 121 S.Ct. 2351 (footnotes omitted).
Though the Colorado II Court unambiguously found the application of the Party Expenditure Provision to coordinated expenditures to be facially constitutional, the Plaintiffs argue that “Colorado II expressly left open the as-applied question of whether parties’ own speech may be limit *428 ed as contributions.” Plaintiffs-Appellants’ Brief at 12 (footnote omitted). This argument is based on a footnote in the majority opinion of Colorado II that states:
Whether a different characterization, and hence a different type of scrutiny, could be appropriate in the context of an as-applied challenge focused on application of the limit to specific expenditures is a question that, as JUSTICE THOMAS notes, we need not reach in this facial challenge.
The Party appears to argue that even if the Party Expenditure Provision is justified with regard to coordinated expenditures that amount to no more than payment of the candidate’s bills, the limitation is facially invalid because of its potential application to expenditures that involve more of the party’s own speech. But the Party does not tell us what propoi'tion of the spending falls in one category or the other, or otherwise lay the groundwork for its facial over-breadth claim.
533 U.S. at 456 n. 17, 121 S.Ct. 2351 (citations omitted). The Plaintiffs further rely on Justice Thomas’ dissent, in which he states:
To the extent the Court has not defined the universe of coordinated expenditures and leaves open the possibility that there are such expenditures that would not be functionally identical to direct contributions, the constitutionality of the Party Expenditure Provision as applied to such expenditures remains unresolved. At oral argument, the Government appeared to suggest that the Party Expenditure Provision might not reach expenditures that are not functionally identical to contributions.
Id at 469 n. 2, 121 S.Ct. 2351 (Thomas, J., dissenting).
Assuming that the Colorado II Court left open the possibility for an as-applied challenge to the Party Expenditure Provision’s application to coordinated spending, the facts and arguments in the instant case do not present this court with that question. Acceptance of the Plaintiffs’ “own speech” argument would effectively eviscerate the Supreme Court’s holding in Colorado II, which dealt only with coordinated expenditures. The Court in Colorado II expressly recognized that Congress has the power to regulate coordinated expenditures in order to combat circumvention of the contribution limits and political corruption. Id. at 456, 121 S.Ct. 2351 (majority opinion) (‘We accordingly apply to a party’s coordinated spending limitation the same scrutiny we have applied to the other political actors, that is, scrutiny appropriate for a contribution limit, enquiring whether the restriction is ‘closely drawn’ to match what we have recognized as the ‘sufficiently important’ government interest in combating political corruption.”). The Colorado II Court stated:
... [T]he question is whether experience under the present law confirms a serious threat of abuse from the unlimited coordinated party spending as the Government contends. It clearly does. Despite years of enforcement of the challenged limits, substantial evidence demonstrates how candidates, donors, and parties test the limits of the current law, and it shows beyond serious doubt how contribution limits would be eroded if inducement to circumvent them were enhanced by declaring parties’ coordinated spending wide open.
Id. at 457, 121 S.Ct. 2351 (citation and footnote omitted).
If this court were to accept the Plaintiffs’ exceedingly broad argument, we would be reaching a conclusion inconsistent with the Colorado II Court’s teaching that coordinated expenditures may be restricted. The RNC’s sole argument *429 throughout has been that there is no limit to its claim that Congress cannot regulate a party’s own speech regardless of the degree of coordination with the candidate. The district court succinctly identified the Plaintiffs’ argument: “Plaintiffs claim that a party coordinated communication disclosed as paid for by the party is the party’s ‘own speech’ even if a candidate indicates in the communication that he has approved the message.” Cao (District Court), 688 F.Supp.2d at 531. Moreover, “Plaintiffs claim that a party coordinated communication disclosed as having been paid for by the party is the party’s ‘own speech’ even if the candidate or her campaign actually creates the communication and passes it along to the party.” Id. at 530. Thus, under the Plaintiffs’ standard, all coordinated expenditures paid for and adopted by the party would be considered a party’s own speech and not subject to restriction.[22] As demonstrated above, the Colorado II Court, as well as the Court’s earlier cases, clearly held that coordinated expenditures may be restricted to prevent circumvention and corruption.
We find the Colorado II Court’s concern with corruption particularly important since, in the present case, the Plaintiffs admit that they themselves have already taken steps to circumvent the Act’s individual donor contribution limits. The district court found that “[t]he RNC encourages its candidates to tell their ‘maxed out’ donors to contribute to the RNC.” Cao (District Court), 688 F.Supp.2d at 526. Representative Cao confirmed in his deposition this behavior by the RNC. “Congressman Cao has personally suggested to donors who had given the maximum amount to his campaign that they could also contribute to the party.” Id. Furthermore, the district court found that “the party has shared [its] donor list” with its federal candidates, and that “[t]he sharing of information also happens in the other direction^ since the party] receives information from federal candidates about who has contributed to their campaigns.” Id. at 523. The district court also found that “the RNC organizes ‘fulfillment’ events to which individuals who have made a large contribution to the RNC of a specified amount are invited” so that they can have special access to federal lawmakers.[23] Id. The Colorado II Court warned that “[i]f the effectiveness of party spending could be enhanced by limitless coordination, the ties of straitened candidates to prosperous ones and, vicariously, to large donors would be reinforced as well.” Colorado II, 533 U.S. at 460 n. 23, 121 S.Ct. 2351. The above facts demonstrate the potential corruption and abuse that concerned Colorado II. Id. at 456, 121 S.Ct. 2351. At oral argument, the en banc court gave counsel every opportunity to address the concern that the Plaintiffs’ argument conflicts with the Supreme Court’s control *430 ling precedent.[24] In response, Plaintiffs’ counsel reiterated that the challenge was an as-applied challenge, whereas Colorado II was a facial challenge. Colorado II, the Plaintiffs assert, left open the possibility of their as-applied challenge.
Colorado II certainly left open the possibility for an as-applied challenge to the Party Expenditure Provision as it applies to coordinated expenditures; it is well-established that the facial upholding of a law does not prevent future as-applied challenges. E.g., Wisconsin Right to Life, Inc. v. FEC, 546 U.S. 410, 411-12, 126 S.Ct. 1016, 163 L.Ed.2d 990 (2006) (holding that the plaintiff could bring an as-applied challenge to BORA despite the Court upholding the statute on its face). However, simply characterizing the challenge as an as-applied challenge does make it one. “While rejection of a facial challenge to a statute does not preclude all as-applied attacks, surely it precludes one resting upon the same asserted principle of law.” Penry v. Lynaugh, 492 U.S. 302, 354, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (Scalia, J., dissenting). See also RNC v. FEC, 698 F.Supp.2d 150, 157 (D.D.C.2010) (“In general, a plaintiff cannot successfully bring an as-applied challenge to a statutory provision based on the same factual and legal arguments the Supreme Court expressly considered when rejecting a facial challenge to that provision. Doing so is not so much an as-applied challenge as it is an argument for overruling a precedent.”), summ. aff'd, RNC v. FEC, — U.S.-, 130 S.Ct. 3544, — L.Ed.2d - (2010). The argument raised by the Plaintiffs in this case rests not on a sufficiently developed factual record, but rather, on the same general principles rejected by the Court in Colorado II, namely the broad position that coordinated expenditures may not be regulated.[25] Finding for the Plaintiffs would require us to hold that Congress cannot limit a party’s expenditures on a campaign ad, the content of which the party adopts, regardless of the degree of coordination with the candidate.[26] Because such a conclusion would effectually overrule all restrictions on coordinated expenditures, the RNC’s argument must fail in light of Colorado II.
The Plaintiffs further argue that the Court’s recent decision in Citizens United *431 has signaled a change in the law in this area. Undoubtedly, Citizens United altered the legal landscape with respect to corporations and labor unions, because the Supreme Court held that these entities may make independent campaign expenditures free of Congressional limitations. See 130 S.Ct. at 913. However, as we discussed earlier, the Supreme Court’s decision in Citizens United has no bearing on whether Congress has the power to restrict political parties’ coordinated expenditures. Citizens United addresses only independent expenditures and simply does not address coordinated expenditures. Regardless, the holding of Citizens United — ’that the restrictions on independent expenditures by corporations and labor unions violated the First Amendment — is entirely consistent with the Court’s decision in Colorado I, in which the Court held that Congress could not regulate the independent expenditures of a party. See Colorado I, 518 U.S. at 617, 116 S.Ct. 2309. Thus, as we have previously stated, there is no reason for us to conclude that Citizens United undermines Colorado ITs holding that Congress can regulate a party’s coordinated expenditures.[27]
The Plaintiffs have offered much rhetoric regarding the Party Expenditure Provision’s “suppression” of their speech, yet as the district court noted in its factual findings, “party committees like the RNC rarely reach their legal limit for coordinated expenditures in a particular House or Senate race.” Cao (District Court), 688 F.Supp.2d at 520.[28] Overall, “[i]n the 2008 election cycle, the major national party committees (RNC and DNC) supported their federal candidates with a total of $529,262 in contributions, $31,256,379 in coordinated expenditures, and $54,563,499 in independent expenditures.” Id. at 517. Thus, the Party Expenditure Provision hardly amounts to a ban on free speech. Instead, the Act’s cap on coordinated expenditures seems a small price to pay to preserve “the integrity of our system of representative democracy.” Buckley, 424 U.S. at 26, 96 S.Ct. 612.
The Plaintiffs’ “own speech” argument cannot be reconciled with Colorado II. As such, we find that the expenditure and contribution limits and contribution provision in 2 U.S.C. §§ 441a(a)(2)(3), 441a(a)(2)(A), and 441a(a)(7)(B)(I) do not violate the First Amendment rights of one or more of the Plaintiffs as applied to coordinated communications that convey the basis for the party’s expressed support.
IV.
The principal disagreement we have with the dissents is over the scope of Plaintiffs’ argument with respect to the constitutionality of contribution restrictions relative to coordinated expenditures. Based on the record, briefs and oral argument, we have explained above why we conclude that the only issue Plaintiffs presented to us for decision is whether the RNC’s “own speech” is subject to regulation and restriction under FECA. As we read Chief Judge Jones’s dissent, she agrees that Colorado II answers this question and authorizes regulation of RNC’s own speech generally. Chief Judge Jones’s principal argument is that Plaintiffs also presented for decision whether *432 the Act can constitutionally restrict expenditures for the Cao Ad involved in this case when that ad was coordinated between the RNC and the candidate as to “timing only.”
Contrary to the position outlined above, Chief Judge Jones’s dissent asserts first that the Plaintiffs raised this latter “narrow” issue in its brief. To support this assertion, Chief Judge Jones relies on two sources in Plaintiffs’ briefs. First, she relies on recitations of Joint Stipulation of Fact ¶ 32, which states that “RNC intends to coordinate the RNC Cao Ad with Joseph Cao as to the best timing for the Ad, but otherwise the Ad would not be coordinated with Cao.” The recitation of a stipulation of fact does not present an issue on appeal. The only other passage in the Plaintiffs’ briefs that the Chief Judge relies on to support her view that Plaintiffs wish to present this as an issue on appeal is in a footnote in the Plaintiffs’ reply brief. The law is clear in this circuit that we do not consider arguments made for the first time in an appellant’s reply brief. Woods v. Johnson, 75 F.3d 1017, 1035 n. 24 (5th Cir.1996) (“[W]e do not consider issues raised for the first time in a reply brief.”); Cavallini v. State Farm Mt. Auto Ins. Co., 44 F.3d 256, 260 n. 9 (5th Cir.1995); see also Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir.1994) (“A party who inadequately briefs an issue is considered to have abandoned the claim.”) (citing Villanueva v. CNA Ins. Cos., 868 F.2d 684, 687 n. 5 (5th Cir.1989)). Moreover, we read this footnote as an attempt by Plaintiffs to explain the legal question Colorado II left open, particularly Justice Thomas’ view of the open question which he articulated in his dissent. This passage notes that Colorado II left open “whether some other speech communications may not be regulated because coordination is de minimis (e.g., just timing) ...” See Jones Dissent at 438 (citing footnote 5 in Plaintiffs-Appellants’ Reply Brief). Plaintiffs, however, make no argument that coordination of the Cao Ad (with timing plus knowledge of content) is de minimis. Notably, this is the only passage referring to “de minimis” coordination in either of Plaintiffs’ briefs. That Plaintiffs never intended to make the de minimis argument is further supported by the fact (as we will discuss below) that counsel repeatedly disclaimed an intent to raise this narrow issue on appeal.
Even if we accept that the argument in Plaintiffs’ reply brief properly raised this issue for our consideration, it is clear to us that counsel for Plaintiffs at oral argument abandoned this issue. We have quoted at length above counsel’s persistent disclaimers that he is relying on the fact that the coordination between the candidate and the party was de minimis. He consistently argues that once the speech is determined to be the party’s “own speech,” then regulation or restrictions on that speech is unconstitutional. All of the responses given by counsel to questions from the court disclaiming that he is making this narrow argument cannot be explained as agreeing that the Cao Ad may amount to coordination under the regulation but failing to concede that the Cao Ad amounts to coordination for purposes of our constitutional analysis of Plaintiffs’ claim. See Jones Dissent at 438 n. 5.
Even if we further consider that Plaintiffs made and did not abandon the argument that the coordination between the candidate and the party was de minimis, based on the stipulation and admission of counsel the coordination cannot be considered de minimis. At oral argument, Plaintiffs’ counsel conceded that the RNC intended to coordinate the Cao Ad with Cao not only with regard to tinfing, but also by providing Cao with advance knowl *433 edge of the Cao Ad’s content.[29] Plaintiffs’ counsel expressly repeated this concession in a supplemental Rule 28(j) letter filed with the court after oral argument stating that “RNC provides a specific ad, a specific coordinating candidate, and specific detail as to coordination nature (timing, with content awareness).” (emphasis added).[30] These concessions by counsel are consistent with the allegations of the Plaintiffs’ Second Amended Complaint, which recites the specific text of the Cao Ad, necessarily indicating that Plaintiffs intended to provide Cao with advance knowledge of the Cao Ad’s content. See Second Amended Complaint ¶ 44.[31]
This “content awareness” stipulation has significance that the dissents completely overlook. For instance, given advance knowledge of the Cao Ad’s content, if Cao approved of the content and found it favorable to his campaign, he may have told or requested the RNC to run the ad frequently during prime hours. If Cao disapproved of the Cao Ad’s content and found it unfavorable to his campaign, he may have told or requested the party to run it infrequently during off hours, or perhaps not at all. This degree of coordination of campaign expenditures contrasts sharply with the Supreme Court’s functional definition of independent expenditures. Whereas the Supreme Court has explained that an independent expenditure representing the party’s own views may at times work against the candidate’s interests,[32] timing-plus-content-awareness coordination may ensure that a party’s message virtually always works in the candidate’s favor.[33] See Buckley, 424 U.S. at 47, 96 S.Ct. 612; Colorado II, 533 U.S. at 464, 121 S.Ct. 2351.
For these reasons we cannot agree with Chief Judge Jones’s conclusion that “there is no functional difference between the Cao Ad and a constitutionally protected independent expenditure.” Jones Dissent at 445. As we have explained above, knowledge of content plus timing coordination makes a huge difference relative to the benefit of the ad to the candidate that the dissent fails to recognize — namely, the candidate’s ability to direct approved content for maximum impact and redirect dis *434 approved content for minimum impact on his campaign.[34]
This type of coordinated activity, moreover, implicates the same corruption and circumvention concerns of the Colorado II Court. As discussed above, the court is particularly concerned with Plaintiffs’ admissions that they have already taken steps to circumvent the Act’s individual donor contribution limits. Furthermore, to quote Judge Clement’s dissent, if Cao were asked “to provide input on its content” or “asked to provide his consent to run the ad ... that would indeed raise a suspicion that the parties were attempting to circumvent the rules against coordination so that the RNC could pay the bill for Cao’s speech — the evil at which the coordination rules are aimed.” Clement Dissent at 452. This is exactly the scenario that is contemplated by the coordination of timing with the addition of advance content awareness, which both dissents refuse to acknowledge. Therefore, based on what we know of the extent of the proposed coordination on this scant record, it is reasonable to infer that the coordination of the Cao Ad between the candidate and the party as to timing with the candidate’s prior knowledge of the of the ad’s content would amount to a coordinated expenditure subject to restriction under Colorado II.
In the absence of additional facts as to the actual extent of the coordination, all the Court is left with is the obligation to give reasonable inferences to the evidence that was produced. And it is the Plaintiffs’ burden in an as-applied challenge of this nature to produce the facts upon which he bases his challenge. Khachaturian, 980 F.2d at 331. In other words, a plaintiff seeking an injunction in an as-applied challenge generally has the burden to allege enough facts for the Court to decide the constitutional claim while avoiding “ ‘premature interpretation of statutes’ ” requiring speculation or conjecture on a “ ‘factually barebones record.’ ” Milavetz, Gallop & Milavetz, P.A. v. United States, — U.S.-, 130 S.Ct. 1324, 1344, 176 L.Ed.2d 79 (2010) (Thomas, J., concurring in part and concurring in the judgment) (quoting Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008)). The Supreme Court “generally disapprove^] of such challenges.” Id. “When forced to determine the constitutionality of a statute based solely on such conjecture, we will uphold the law if there is any ‘conceivable’ manner in which it can be enforced consistent with the First Amendment.” Id. at 1345.[35]
In sum, we are satisfied that the de minimis coordination issue was not presented to the court for decision. Indeed, we find it strange that the dissents take an argument not made in the district court, nor presented to us on appeal — and wholly disavowed by Plaintiffs’ counsel during oral argument — and attempt to *435 raise it like a Phoenix from the ashes. However, as a court comprised of Article III judges, our role is not to create arguments for adjudication — but rather, our role is to adjudicate those arguments with which we are presented. Thus, we should decline the dissents’ invitation to serve as advocates for the Plaintiffs and arbiters of our own engendered claims. Nonetheless, for the sake of completeness, even if the court were to conclude that this issue was presented, it is clear to us that an expenditure for an ad advocating the election of the candidate coordinated as to timing, when the candidate has knowledge of the content of the ad, amounts to a coordinated expenditure that may be constitutionally regulated under Colorado II.
We also disagree with the position advocated by Chief Judges Jones and Judge Clement that the WRTL analysis applies to this case. In WRTL, the Court considered whether the government could regulate an independent expenditure under § 203 of BCRA for payment of an “issue advocacy” ad. 551 U.S. at 455, 127 S.Ct. 2652. No question was raised that the ad was coordinated with the candidate. The Court applied strict scrutiny to the statute and held that BCRA as applied to this ad did not pass constitutional muster. This holding is not inconsistent with Buckley, Colorado I, and Colorado II, all of which make it clear that strict scrutiny applies to regulation of independent expenditures for political speech.[36]
V.
For the foregoing reasons, we answer the questions certified to the en banc court as follows. First, the Plaintiffs do have standing to bring their claims. Second, § 441a(a)(2)(A)’s $5,000 contribution limit is constitutional even though it imposes the same limits on parties as on PACs and is not adjusted for inflation. Third, §§ 441a(a)(2)(3), 441a(a)(2)(A), and 441a(a)(7)(B)(i) are not unconstitutional as applied to the Plaintiffs. Moreover, we find that the district court did not abuse its discretion in dismissing the frivolous claims. Accordingly, we remand this case to the district court for entry of judgment consistent with this opinion.

. As amended by the Bipartisan Campaign Reform Act ("BCRA”) of 2002, Pub.L. No. *414 107-155, 116 Stat. 81 (2002).

. Initially, the Republican Party of Louisiana ("LA-GOP”) was also a Plaintiff to the action. The district court, however, determined that the LA-GOP did not have standing under 2 U.S.C. § 437h. No party has appealed this portion of the district court's order. Accordingly, the LA-GOP is no longer a party to the case now before the court.

. Plaintiffs’ complaint raises claims under the First and Fifth Amendments, FECA, 2 U.S.C. § 43 7h, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

. Section 437h provides:
The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

.Section 441a(d)(2)(3) states:
(2) The national committee of a political party may not make any expenditure in connection with the general election campaign of any candidate for President of the United States who is affiliated with such party which exceeds an amount equal to 2 cents multiplied by the voting age population of the United States (as certified under subsection (e) of this section). Any expenditure under this paragraph shall be in addition to any expenditure by a national committee of a political party serving as the principal campaign committee of a candidate for the office of President of the United States.
(3) The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general *415 election campaign of a candidate for Federal office in a State who is affiliated with such party which exceeds—
(A) in the case of a candidate for election to the office Senator, or of Representative from a State which is entitled to only one Representative, the greater of—
(i) 2 cents multiplied by the voting age population of the State (as certified under subsection (e) of this section); or
(ii) $20,000; and (B) in the case of a candidate for election to the office of Representative, Delegate, or Resident Commissioner in any other State, $10,000.

. Section 441a(a)(2)(A) states that "(2) No multi candidate political committee shall make contributions — (A) to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $5,000 .... ”

. In addition to actual corruption, the Buckley Court found that the Government had a compelling interest in preventing the appearance of corruption. Id. at 27, 96 S.Ct. 612.

. Section 441a(a)(7)(B)(i) states that "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate .... ”

. Section 109.37 defines "party coordinated communications” as those communications that are (1) paid for by the party, (2) satisfy a particular content standard, and (3) coordinated with the candidate as defined by § 109.21 (d)(l)(6). The content standards set forth in § 109.37 require that the communication be either “[a] public communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing,” or "[a] public communication that expressly advocates the election or defeat of a clearly identified candidate for Federal office,” or a "public communication [that] refers to a clearly identified House or Senate candidate and is publicly distributed ... in the clearly identified candidate's jurisdiction 90 days or fewer before the clearly identified candidate's general, special, or runoff election, or primary or preference election, or nominating convention or caucus.” Section 109.37(a)(2)(iii)(B) provides a similar 120 day time period for public communications referring to a Presidential or Vice Presidential candidate.

. For example, under § 441a(d)(3), the RNC may make expenditures of up to $20,000 in connection with a candidate for U.S. Senate, but may only make expenditures of up to $10,000 in connection with a candidate for the U.S. House of Representatives. Plaintiffs argument is that because § 441a(d)(3)(A)(ii) allows for expenditures of up to $20,000 for Senate candidates, the $10,000 restriction for House candidates is unconstitutionally low.

. Quite to the contrary, the evidentiary record reveals that Cao has had no difficulty amassing an impressive amount of resources for his campaigns. During the 2008 cycle, then-candidate Cao’s congressional campaign had receipts of $242,531. As of June 30, 2009, he had reported $516,957 in total receipts.

. The district court’s factual findings further support the district court's conclusion that the $5,000 limitation does not preclude parties from fulfilling their roles in funding the campaigns of federal candidates. As the district court noted, ”[i]n the 2008 election cycle, parties supported their federal candidates with a total of $529,262 in contributions, $31,256,379 in coordinated expenditures, and $54,563,499 in independent expenditures.” Cao (District Court), 688 F.Supp.2d at 549.

. The Randall Court provided two additional reasons for finding Act 64 unconstitutional: first, the state statute provided no generous additional limit for coordinated party expenditures, and second, each limit applied to all national, state, and local affiliates of a party combined, as well as both the primary and general elections combined. See id. at 257, 249, 259, 126 S.Ct. 2479. These factors are noticeably absent from the Plaintiffs’ present challenge.

. Notably, in the 2008 election cycle, political parties made $280,873,688 in independent expenditures. Cao (District Court), 688 F.Supp.2d at 518.

. It is worth noting that no court has ever invalidated a contribution limitation based solely on its failure to index for inflation.

. The following exchange took place at oral argument:
Judge Davis: When the party allowed the candidate to, consult the candidate on timing, and apparently that's all we know and that's all that's knowable because nothing took place, why is that not coordinated ...
Plaintiffs' Counsel: It is.
Judge Davis: ... under the regulations it probably would be ...
Plaintiffs' Counsel: It is.
Judge Davis: ... why is it not?
Plaintiffs’ Counsel: It is. Absolutely. To consult with the timing it means that it is coordinated. Now, they would rather talk about, you know, what happens if the candidate, you know, wrote the ad and gave it to the party. Well there’s no like degree of being pregnant. It's either coordinated or not coordinated ....
Plaintiffs' counsel further stated in response to a question from Judge Owen that "... [0]ur argument is if it is our speech it doesn’t make it independent. We acknowledge that the Cao ad, and they [the FEC] acknowledge that the Cao ad, is coordinated.”

. Presumably this argument would apply to any person’s or entity’s “own speech.”

. See Second Amended Complaint, 43-44, 83-85.

. See Cao (District Court), 688 F.Supp.2d at 539-42.

. See Plaintiffs-Appellants Brief at 11-25. The Plaintiffs’ state in their brief that “[in this certified question], Plaintiffs-Appellants challenged whether a party’s 'own speech’ may be deemed a contribution.” Id. at 11. “Apolitical party's 'own speech’ is speech that is attributable to it, even if input on the speech as to details such as content, media, and timing was received from others, such as a party's media consultants, script writers, pollsters, officials, constituency, ideological allies, and candidates.” Id. at 16 (footnote omitted). “Attribution belongs to the entity that pays for and adopts the speech.” Id. "Cao Ad is clearly RNC's own speech because it would be attributable to RNC and bear a disclaimer showing that RNC paid for the ad.” Id. at 17. This "own speech” argument is the sole argument Plaintiffs make to the en banc court on this issue.

. By its terms, § 608(e)(1) did not apply to national political parties. Since Buckley, § 608(e)(1) has been repealed and replaced with similar provisions in 2 U.S.C. § 441a.

. The district court stated that "[t]he only type of party-coordinated communication that plaintiffs believe is not a party’s 'own speech’ and therefore may be constitutionally limited is one that a campaign airs and for which the party merely pays the bill.” Cao, 688 F.Supp.2d at 531. However, under Plaintiffs' argument even this type of communication would be considered the party’s own speech if the party adopted the ad as its own.

. The district court found the following:
The RNC has created tiers of donors with specified benefits based on levels of annual giving: For example, donors who give $15,000 receive intimate luncheons, dinners, and meetings with key policymakers; donors who give $30,400 enjoy exclusive private functions with elected Republican leaders; and donors who commit to raising $60,800 receive at least one ... exclusive event during the year, as well as other intimate events with key GOP policymakers.
Cao (District Court), 688 F.Supp.2d at 523 (internal quotation marks omitted).

. Chief Judge Jones questioned RNC’s counsel in this regard:
[T]he Court has always very often said "well, coordinated expenditures are different.” Now they haven't delineated the line between speech and coordination, but it seems to me you are trying to pretty much shatter that barrier. And the second thing is, Colorado I would have been decided in the way that you advocate if the Court had accepted your position. So what has changed since Colorado I?

. The Plaintiffs' Second Amended Complaint raises further concern that this is merely an attempt to overturn Colorado II because the Plaintiffs chiefly rely on the rationale of the Colorado II dissenting opinion. See Second Amended Complaint, 43-44, 83-85.

. Chief Judge Jones posits that we conclude the Cao Ad is a "coordinated” expenditure simply because the government claims it is. She writes: "This court is not bound by the government's simply labeling the speech 'coordinated' .... 'An agency’s simply calling an independent expenditure a "coordinated expenditure” cannot (for constitutional purposes) make it one.’ " Jones Dissent at 443 (quoting Colorado I, 518 U.S. at 621-22, 116 S.Ct. 2309). True enough. We note, however, that we are not relying on the government’s claim that the Cao Ad is coordinated, but rather, we place our reliance on the Plaintiffs' admissions as to the extent of the coordination and Plaintiffs' labeling of their own claim. Notably, in their Rule 28(j) letter to the court, the Plaintiffs once again confirmed that the proposed Cao Ad amounted to coordination: "RNC provides a specific ad, a specific coordinating candidate, and specific detail as to coordination nature (timing, with content awareness).”

. See also RNC v. FEC, 698 F.Supp.2d at 153 (noting that Citizens United did not disturb prior decisions that found limits on contributions to political parties to be constitutional).

. "Although there are at least 468 federal elections each cycle, Republican committees reached the maximum amount of coordinated expenditures in only seven congressional races in 2008, and in two races in 2006.” Cao (District Court), 688 F.Supp.2d at 520.

. Upon questioning by Judge Owen, counsel stated “I think that is part of the facts, that they knew what the Cao Ad said,” and again confirmed that content knowledge is "part of the fact pattern.”

. FEC counsel's own supplemental Rule 28(j) letter to the court correctly observed that the admission by Plaintiffs’ counsel at oral argument "clarified for the first time that Cao not only planned to coordinate as to timing, but also would be aware of the content of the advertisement.”

. The full text of the Cao Ad appearing in the Second Amended Complaint also appears in ¶ 43 of Plaintiffs’ First Amended Complaint filed December 4, 2008, two days before the election. Thus, Cao knew of the Cao Ad’s content at least two days before the election, and if relief had been immediately granted the coordination would have taken place with his knowledge of the Cao Ad’s content.

. Cao’s experience with the RNC’s previous independent expenditures confirms this distinction. He testified that some of the RNC's prior independent expenditures harmed his election chances. Deposition of Anh "Joseph” Cao ("Cao Dep.”) at 42 (FEC Exh. 4 to Proposed Findings of Fact).

. This is consistent with Cao's understanding of the nature of the intended coordination. At deposition, he testified as to the following:
I would like to know the contents of those ads .... And so if we were allowed to coordinate it with them, I would have loved to have their fundings and their support and — and to basically coordinate how the ads should be read or — what the ads should say. What our focus — what we want to focus on.
Cao Dep. at 42.

. Consideration of the "content awareness” element of Plaintiffs’ allegations demonstrates the error in many of the dissents' conclusions, including Chief Judge Jones’s assertions that "[t]here is no evidence that he or his campaign ... provided their views on its content,” that "[t]he candidate will not know whether the ad is effective,” and that "[c]on-tent, however, is not at issue in this case.” Jones Dissent at 438, 445, 448.

. This is especially true in the context of a pre-enforcement as-applied action. Id.; see also Holder v. Humanitarian Law Project, - U.S.-, 130 S.Ct. 2705, 2722, 177 L.Ed.2d 355 (2010) (Denying a pre-enforcement as-applied First Amendment challenge to the material support provisions of federal anti-terrorism law because plaintiffs did not provide any "specific articulation of the degree to which they seek to coordinate their advocacy.”).

. Under WRTL, it is clear that the Cao Ad is an express advocacy ad. The Cao Ad affirmatively asks the reader to join the party in supporting Cao on election day. This meets the requirements of an express advocacy ad. See WRTL, 551 U.S. at 469, 127 S.Ct. 2652. Additionally, the Plaintiffs' themselves characterize the Cao Ad as "a specific express advocacy communication that RNC intends to make ...." Joint Stipulation of Facts V 31.