# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-51366

United States Court of Appeals
Fifth Circuit
**FILED**
February 1, 2018

Lyle W. Cayce
Clerk

DONALD ZIMMERMAN,

Plaintiff - Appellant Cross-Appellee

v.

CITY OF AUSTIN, TEXAS,

Defendant - Appellee Cross-Appellant

Appeals from the United States District Court
for the Western District of Texas

Before SMITH, BARKSDALE, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Donald Zimmerman, a former Austin City Councilmember, challenges four provisions of Austin's campaign-finance law: a base limit on contributions to candidates; an aggregate limit on contributions from persons outside of the Austin area; a temporal restriction prohibiting all contributions before the six months leading up to an election; and a disgorgement provision requiring candidates to distribute excess campaign funds remaining at the end of an election. Following a bench trial, the district court upheld the base limit, concluded that Zimmerman lacked standing to challenge the aggregate limit, and struck down the temporal restriction and the disgorgement provision as

No. 16-51366

unconstitutional abridgements of First Amendment rights.  For the following reasons, we affirm.

## I.

## A.

In 1997, voters in the city of Austin, Texas, approved a ballot initiative to amend the City Charter and add various restrictions on campaign contributions and expenditures.  The measure passed with 72% of the vote.  It was spearheaded by a group called "Austinites for a Little Less Corruption! a/k/a/ No More Corruption!" and, according to testimony presented at trial, was a response to the public perception that large campaign contributions from land developers and those with associated interests were creating a corrupt, "pay-to-play" system in Austin politics.

Four of the restrictions are at issue here.  First, Article III, § 8(A)(1)—the base contribution limit—prohibits candidates for mayor or city council from accepting campaign contributions of more than "$300 per contributor per election from any person," with that amount to be adjusted annually for inflation.  Austin, Tex. Code, Art. III, § 8(A)(1).  At the time this suit was filed, the applicable limit was $350.  Second, § 8(A)(3)—the aggregate contribution limit—prohibits candidates from accepting "an aggregate contribution total of more than $30,000 per election, and $20,000 in the case of a runoff election, from sources other than natural persons eligible to vote in a postal zip code completely or partially within the Austin city limits," (which the parties refer to as the "zip code envelope").  *Id.* § 8(A)(3).  Those amounts are also subject to adjustment for inflation, and were $36,000 and $24,000, respectively, at the time this suit was filed.  Third, § 8(F)(2)—the temporal restriction—prohibits candidates or officeholders from soliciting or accepting political contributions except for during the 180 days before an election.  *Id.* § 8(F)(2).   Finally, § 8(F)(3)—the disgorgement provision—requires candidates to "distribute the

2

No. 16-51366

balance of funds received from political contributions in excess of any remaining expenses" to the candidate's contributors, a charitable organization, or the Austin Fair Campaign Fund. *Id.* § 8(F)(3). Candidates may, however, retain up to $20,000 "for the purposes of officeholder expenditures." *Id.* § 8(F)(6).

As will become relevant, Texas law distinguishes between "campaign contributions" and "officeholder contributions." "Campaign contributions" are contributions "to a candidate or political committee that [are] offered or given with the intent that [they] be used in connection with a campaign for elective office or on a measure." Tex. Elec. Code § 251.001(3). "Officeholder contributions" are contributions "to an officeholder or political committee that [are] offered or given with the intent that [they] be used to defray" officeholder expenses. *Id.* § 251.001(4). The catchall phrase "political contribution" includes both campaign contributions and officeholder contributions. *Id.* § 251.001(5). Section 8(A)(1) of Austin's Charter refers to either "campaign contributions," Austin, Tex. Code, Art. III, § 8(A)(1), or "contribution[s]" generally, *id.* § 8(A)(3). Section 8(F), which specifically states that it incorporates the definitions set forth in the Texas Election Code, *id.* § 8(F)(1), refers to "political contributions." *Id.* § 8(F)(2)–(6).

**B.**

Donald Zimmerman ran for the District 6 seat on Austin's city council in 2014. District 6, located in northwest Austin, had an estimated population of 92,721 in 2014, with 70,808 eligible voters. Six candidates competed for the District 6 seat. Zimmerman won the general election and the ensuing runoff. After serving a two-year term, he ran for re-election in 2016 and lost.

Zimmerman initiated this lawsuit in July 2015, alleging that the four provisions of the Austin City Charter enumerated above are unconstitutional restrictions on free speech. After a bench trial, the district court held that the

base limit was constitutional in light of the city's interest in preventing *quid pro quo* corruption; that Zimmerman did not have standing to challenge the aggregate limit because he did not come close to reaching the relevant limits; that the temporal restriction was an unconstitutional limit on contributions because the city had failed to show that it was sufficiently tailored to serve an interest in preventing *quid pro quo* corruption; and that the disgorgement provision was an unconstitutional restriction on expenditures because the city had failed to show that it was the least restrictive means of preventing *quid pro quo* corruption.   The district court permanently enjoined Austin from enforcing the temporal restriction and the disgorgement provision.  The parties timely cross-appealed the rulings adverse to them.

## C.

"The standard of review for a bench trial is well established:  findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) (quoting *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011)).  "A finding of the trial judge 'is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).  Accordingly, we review the trial judge's factual findings with great deference, and cannot reverse them simply because we would reach a different conclusion.  *See id.*  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Anderson*, 470 U.S. at 574.

No. 16-51366

## II.

Zimmerman first challenges the district court's decision regarding the $350 base limit on campaign contributions.[1]  He contends that the base limit is subject to strict scrutiny as either a content-based restriction on speech or an indirect burden on campaign expenditures and that it fails to pass muster under that stringent standard.  Alternatively, he contends that even if strict scrutiny does not apply, the limit is not justified by a sufficiently important governmental interest and, even if it were, it is not sufficiently tailored to that interest.  We disagree on all points.

## A.

First, the limit is not a content-based restriction on speech.  Zimmerman argues that the base limit applies only to campaign contributions, but not officeholder contributions, because the language of the base limit refers only to "campaign contributions," while other provisions in the Charter refer more broadly to "political contributions"—which, under the Texas Election Code, includes both "campaign contributions" and "officeholder contributions." According to his argument, that leaves officeholders free to collect unlimited amounts for the purpose of defraying officeholder expenses, including the production and dissemination of constituent newsletters, *see* Austin, Tex. Code § 2-2-41 (stating that officeholders may use funds from officeholder accounts for the purpose of "newsletters").  On that basis, Zimmerman argues that

---

[1] The base limit applies to contributions to candidates for both mayor and city council. Austin Tex. Code, Art. III, § 8(A)(1).  However, we restrict our review to only the limit on contributions to candidates for city council because Zimmerman has not run for mayor in the past nor alleged any intent to run for mayor and thus does not have standing to challenge Austin's contribution limits as they apply to mayoral candidates. *See Daggett v. Comm'n on Gov't Ethics & Election Practices*, 205 F.3d 445, 462–63 (1st Cir. 2000) (affirming dismissal of challenge to gubernatorial campaign limits on standing grounds where no plaintiff had run for governor in the past or claimed that, but for the limit, they would give more than the challenged limit to a gubernatorial candidate).

5

because a contributor can give only $350 to fund campaign speech but can give an unlimited amount to fund a newsletter describing an incumbent's achievements, the base limit constitutes a content-based restriction on speech.

Austin responds that the base limit draws no such distinction between campaign contributions and officeholder contributions. It points first to subsection (G) of Article III, Section 8 of the Charter, which provides that "[a]ny incumbent mayor or councilmember is subject to the regulations applied to candidates for the office he or she holds." Austin, Tex. Code, Art. III, § 8(G). It also points to subsection (F), the only subsection of Article III, § 8 that states that its terms "have the same meaning they have in Title 15 of the Texas Election Code." *Id.* § 8(F). Because the base limit appears in subsection (A), Austin argues that it does not incorporate the definitions from the Texas Election Code and that, although subsection (A) refers only to "campaign contributions," it is intended to reach any contribution to a candidate or incumbent officeholder. Finding Austin's interpretation to be a reasonable interpretation of the Charter, and one that avoids a possible constitutional conflict, we defer to it. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) ("We defer to [a city's] interpretation of how the law is to be enforced, so long as it does not conflict with the statutory text." (quoting *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 895 (5th Cir. 2012))); *id.* ("Our task as a federal court is, to the extent possible, to construe the provisions to avoid a constitutional conflict." (quoting *Voting for Am., Inc.*, 488 F. App'x at 895)). In light of that interpretation, the base limit does not constitute a content-based regulation on speech.

Zimmerman's second argument for strict scrutiny is more easily disposed of. He contends that the base limit burdens expenditures and that burdens on expenditures, even indirect ones, are subject to strict scrutiny. *See, e.g., Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 736–40, 748

No. 16-51366

(2011) (applying strict scrutiny to law that indirectly burdened expenditures by penalizing personally financed candidates for spending above a certain threshold). In some vague sense, of course, contribution limits indirectly burden expenditures. You have to raise money to spend it, and contribution limits mean that you cannot raise as much from any one contributor. But the Supreme Court has been clear that contribution limits are analytically distinct from expenditure limits, create a far lesser burden on speech, and, for that reason, are subject to less searching scrutiny. *See FEC v. Colo. Republican Fed. Campaign Comm'n*, 533 U.S. 431, 437 (2001) (noting "line between contributing and spending"); *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 259–60 (1986) ("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending."). We decline Zimmerman's invitation to blur the line that the Supreme Court has drawn.

**B.**

As a limit on political contributions, Austin's base limit is subject to the closely-drawn test set forth in *Buckley v. Valeo*, 424 U.S. 1, 25 (1976). In *Buckley*, the Supreme Court explained that contribution limits are generally subject to a lower level of scrutiny than expenditure limits because "a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20. Because "[a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support," the communicative value of a contribution "does not increase perceptibly with the size of [the] contribution." *Id.* at 21. A contribution limit therefore "involves little direct restraint on [a contributor's] political communication." *Id.* However, contribution limits do impinge on associational freedoms by limiting

7

a contributor's ability to affiliate him or herself with a candidate. *Id.* at 22. And, while they do not directly relate to a candidate's ability to speak, contribution limits "could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." *Id.* at 21. Accordingly, they are subject to something akin to intermediate scrutiny and "may be sustained if the [governmental entity] demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25.

### 1.

The only governmental interests yet recognized by the Supreme Court as sufficient to justify limits on campaign contributions are the prevention of actual corruption and its appearance. *See id.* at 26–27 (defining interest in terms of "limit[ing] the actuality and appearance of corruption resulting from large individual financial contributions"); *McCutcheon v. FEC*, 134 S. Ct. 1434, 1450 (2014); *Citizens United v. FEC*, 558 U.S. 310, 359 (2010). While the importance of those interests is beyond dispute, their invocation still must be justified with some evidentiary showing that the state or locality enacting a contribution limit faces a problem of either actual corruption or its appearance. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390–94 (2000). "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Id.* at 391. When following a well-trodden path, the evidentiary bar is not high, but the existence or perception of corruption must still be more than "mere conjecture." *Id.* at 391–92.

No. 16-51366

Here, Austin has demonstrated a sufficiently important interest in preventing either actual corruption or its appearance.[2] Austin presented evidence—credited by the district court—that there was a perception of corruption among Austinites before the limit's enactment in 1997. The evidence presented, including testimony that large contributions created a perception that economic interests were "corrupting the system" and turning the City Council into a "pay-to-play system," as well as the fact that 72% of voters voted in favor of the base limit, is exactly the kind of evidence that the Supreme Court in *Shrink Mo.* found clearly sufficient. *See id.* at 393–94 (stating that the case did "not present a close call" regarding the sufficiency of the state's justification based on testimony that "large contributions have 'the real potential to buy votes,'" "newspaper accounts of large contributions supporting inferences of impropriety," and the fact "an overwhelming 74 percent of the voters" approved the limit (alteration omitted)).

In a creative attempt to evade this Supreme Court guidance, Zimmerman contends that Austin's base limit cannot be justified by an interest in preventing corruption because the limit is too low. He reasons that *Buckley* defined the interest in preventing corruption in terms of *large* contributions, and that Austin's $350 limit bars contributions that are not large and therefore do not implicate the interest in preventing actual corruption. But that conflates *Buckley*'s government-interest inquiry with its tailoring inquiry. *Buckley* sets out a two-part test. First, the need for a contribution limit must be justified by a sufficiently important interest. *See* 424 U.S. at 26–28. Second, the amount of the limit must be sufficiently tailored such that the limit does

---

[2] Zimmerman argues that the legitimacy of Austin's asserted interest is undermined by the fact that the limit applies to campaign contributions but not officeholder contributions, and is therefore underinclusive. However, that argument is of no help because, as we concluded above, we defer to Austin's interpretation of its Charter under which there is not a distinction drawn between campaign contributions and officeholder contributions.

not unnecessarily impinge First Amendment rights. *See id.* at 28–29; *see also Shrink Mo.*, 528 U.S. at 395–97 (considering amount of limit in context of tailoring inquiry, after finding limit justified by government interest in preventing corruption or its appearance). Austin's choice to set the contribution limit at $350 goes to whether the limit is sufficiently tailored, not whether Austin had a sufficiently important interest to justify setting any contribution limit at all. Concluding that Austin had such an interest, we turn to consider whether the limit it established is "closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U.S. at 25.

**2.**

There is no constitutional minimum contribution amount below which legislatures cannot regulate. *Shrink Mo.*, 528 U.S. at 397. Rather, a contribution limit is unconstitutional if it is "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contribution pointless." *Id.* While courts have "no scalpel to probe" what limit is low enough to prevent actual corruption or its appearance but not a dollar lower, *Randall v. Sorrell*, 548 U.S. 230, 248–49 (2006) (quoting *Buckley*, 424 U.S. at 30), they nonetheless must "exercise . . . independent judicial judgment as a statute reaches [the] outer limits" of what is constitutionally permissible, *id.* at 249. Accordingly, where there are "danger signs" that a limit may be so low that it risks "preventing challengers from mounting effective campaigns," then "courts, including appellate courts, must review the record independently and carefully with an eye toward assessing the statute's 'tailoring,' that is, toward assessing the proportionality of the restrictions." *Id.* at 249.

Here, there are no such "danger signs." First, unlike in *Randall*, Austin's contribution limit is per election, not per election cycle, meaning that it is reset between general and runoff elections. *Compare id.* (finding danger sign

present where limit was per election cycle, including primary and general elections) *with* Austin, Tex. Code, Art. III, § 8(A)(1) (establishing contribution limit "per election") *and id.* Art. I, § 2-2-7(A) ("A general election, special election, and a runoff election each have . . . separate campaign periods for purposes of City Charter Article III, Section 8 . . . ."). Second, the $350 limit is on par with limits imposed in other states and localities and upheld by other courts. *See Randall*, 548 U.S. at 250 (finding danger sign where limit at issue was below those imposed by other states and upheld in the past). For example, in *Shrink Mo.* the Supreme Court upheld Missouri's $275 limit—which, adjusted for inflation, was equivalent to approximately $390 at the time this appeal was filed—on contributions to candidates for any office representing fewer than 100,000 people. *See* 528 U.S. at 383; *see also Frank v. City of Akron*, 290 F.3d 813, 818 (6th Cir. 2002) (upholding limits of $100 on contributions to candidates for ward council member and $300 on contributions to candidates for at-large council member and mayor in city of approximately 217,000). Austin's $350 limit on contributions to candidates for city council, who represent districts of approximately 100,000 people, is not so low by comparison as to raise suspicion.[3] Furthermore, and unlike the limit at issue in *Randall*, Austin's contribution limit is indexed for inflation. *Compare* 548 U.S. at 251–52 (finding danger sign where contribution limit was lower than those upheld in prior cases and not indexed for inflation) *with* Austin, Tex. Code, Art. III, § 8(A)(1) (stating that contribution limit shall be adjusted annually in accordance with the Consumer Price Index).

Ultimately, a contribution limit is closely drawn so long as it does not "prevent candidates from 'amassing the resources necessary for effective

---

[3] In 2015, District 6, the district in which Zimmerman ran, had an estimated population of 95,502. That appears from the record to be slightly higher than the average district population.

No. 16-51366

[campaign] advocacy'" or "magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage." *Randall*, 548 U.S. at 248 (quoting *Buckley*, 424 U.S. at 21). Here, there was evidence presented, and credited by the district court, that the contribution limit did not prevent candidates from running "full-fledged" campaigns. One former council person testified that the limit did "[n]ot at all" impede her ability to run an effective campaign and that, in fact, the limit was "good for democracy" because it meant that she "was out there talking to a heck of a lot more people." And as to the advantages of incumbency, Zimmerman himself, an incumbent, was defeated when he ran for reelection in 2016. Accordingly, because the limit does not "render political association ineffective, drive the sound of a candidate's voice below the level of notice, [or] render contribution pointless," *Shrink Mo.*, 528 U.S. at 397, we do not disturb Austin's decision to set the limit at $350. *See McCutcheon*, 134 S. Ct. at 1456 (stating that a campaign-finance regulation need not be "perfect" or "the single best disposition" but "reasonable" and proportional to the interest served).

## III.

Zimmerman next challenges the district court's determination with respect to the aggregate limit. The district court held that Zimmerman lacked standing to challenge the aggregate limit because he had not established a sufficient injury-in-fact traceable to that limit. We agree.

"The requirement that a litigant have standing derives from Article III of the Constitution, which confines federal courts to 'adjudicating actual "cases" and "controversies."'" *Moore v. Bryant*, 853 F.3d 245, 248 (5th Cir. 2017) (quoting *Henderson v. Stalder*, 287 F.3d 374, 378 (5th Cir. 2002)). "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

12

No. 16-51366

Standing "requires that the plaintiff demonstrate that he or she 'has suffered an "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.'" *Assoc. of Cmty. Orgs. for Reform Now (ACORN) v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999) (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)).  An "injury in fact" "must be '(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical' to pass constitutional muster, but it need not measure more than an 'identifiable trifle.'"  *Id.* at 358 (internal citation omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)).  To establish an injury sufficient to raise a First Amendment facial challenge, "a plaintiff must produce evidence of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute."  *Nat'l Fed'n of the Blind of Tex. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011) (quoting *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008)).  A plaintiff's burden to establish standing changes with the procedural posture of the case.  *See ACORN*, 178 F.3d at 357.  This being an appeal from a bench trial, Zimmerman must point to evidence of actual injury.  *See Lujan*, 504 U.S. at 561.

## A.

Zimmerman first contends that the aggregate limit caused an injury in fact because it caused him to change his campaign strategy and withhold solicitations he otherwise would have sent to individuals outside of the Austin area.  He stated in a signed declaration that he would like to purchase a list of conservative donors (costing at least $5,000), but that doing so is "not worth the time and financial investment when the maximum return [he] can hope for is artificially limited to $36,000."  However, Zimmerman's decision to forego solicitations is not an injury sufficient to confer standing.

13

No. 16-51366

First, Zimmerman has failed to establish a serious intention to engage in conduct proscribed by law. *See Miss. State Democratic Party*, 529 F.3d at 545–47 (holding that party lacked standing to challenge statute requiring semi-closed primary elections because it did not take any steps towards holding a fully closed primary and thus failed to establish a "serious interest" in violating the statute). The aggregate limit does not preclude solicitations; it precludes only "accept[ing]" aggregate contributions over the relevant limit from persons outside of the Austin area. *See* Austin, Tex. Code, Art. III, § 8(A)(3). Stating his desire to *solicit* funds thus does not establish an intent to accept funds above the proscribed limit. And, by choosing to not solicit funds, Zimmerman did not take steps towards reaching or exceeding the aggregate limit of the kind that would demonstrate a serious intent to violate the statute. *See Miss. State Democratic Party*, 529 F.3d at 546 ("Without concrete plans or any objective evidence to demonstrate a 'serious interest' in [violating a statute, plaintiff] suffered no threat of *imminent* injury.").

Furthermore, his decision cannot be excused on the ground that soliciting funds from outside of the Austin area would have been futile. The evidence shows that a list of potential donors from outside of the Austin area would have cost Zimmerman approximately $5,000. He could have lawfully accepted up to $36,000 in contributions from such donors. If the investment of $5,000 would have been futile, it was not so because of the aggregate limit. Zimmerman's subjective decision that a potential return of $36,000 was not worth the $5,000 investment does not excuse him from the Article III requirement that a plaintiff must face an injury that is actual or imminent and not conjectural or hypothetical. *See id.* at 547 (rejecting argument that standing requirements can be relaxed when taking steps to engage in prohibited conduct would have been futile, particularly where plaintiff could have, but did not, take certain lawful steps to protect the right allegedly

14

injured).  Nor can the decision to forego solicitations be excused on the ground that it alone would have exposed Zimmerman to possible prosecution.  *Cf. Babbitt*, 442 U.S. at 298 (stating that a plaintiff need not expose himself to prosecution in order to challenge the law).  The aggregate limit prohibits only "accept[ing]" total contributions of more than $36,000 from persons outside of the Austin area.  Austin, Tex. Code, Art. III, § 8(A)(3).  Thus, even if the solicitations had yielded a flood of out-of-area contributions, Zimmerman could have demonstrated a serious interest in violating the limit while still protecting himself from prosecution by not accepting contributions once he reached (or neared) the limit.

Second, standing cannot be conferred by a self-inflicted injury.  *See ACORN*, 178 F.3d at 358.  While solicitations are a form of protected speech, *see United States v. Kokinda*, 497 U.S. 720, 725 (1990), and while government action that chills protected speech without prohibiting it can give rise to a constitutionally cognizable injury, *see Laird v. Tatum*, 408 U.S. 1, 11 (1972), to confer standing, allegations of chilled speech or "self-censorship must arise from a fear of prosecution that is not 'imaginary or wholly speculative.'"  *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) (quoting *Babbitt*, 442 U.S. at 302); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.").  Here, the risk that soliciting funds from persons outside of the Austin area would have resulted in prosecution is speculative and depends in large part on the actions of third-party donors.  Soliciting funds from persons outside of the Austin area would have resulted in possible prosecution only if more than 100 such persons contributed the maximum allowable $350 (and if Zimmerman accepted all such contributions).  There is no evidence in the record of such interested donors.  *See In re Cao*, 619

F.3d 410, 421 (5th Cir. 2010) (holding that political party had standing to challenge expenditure and contribution limits where evidence showed it had met the proscribed limits and would have spent more but for the limits).

Finally, while changing one's campaign plans or strategies in response to an allegedly injurious law can itself be a sufficient injury to confer standing, the change in plans must still be in response to a reasonably certain injury imposed by the challenged law. For example, in *Constitutional Party of Pennsylvania. v. Aichele*, 757 F.3d 347 (3d Cir. 2014), and *Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006), on which Zimmerman relies, the plaintiffs changed their campaign plans in response to alleged future injuries that were "inevitable," *see Miller*, 462 F.3d at 317, or that had in fact been imposed on others in the past, *see Constitutional Party of Pa.*, 757 F.3d at 363–64. But here, prosecution for violating the aggregate limit was far from an inevitable result of soliciting donations from persons outside of the Austin area.

**B.**

Zimmerman also contends that his speech has been chilled due to the threat of an ethics complaint. Relying on *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014), he contends that Austin permits any person, including a political opponent, to file an ethics complaint and that Austin's advice that liability can be avoided if the violation was not "knowing," *see* Austin Tex. Code, Art. I, § 2-2-5(A) (stating that "a person who knowingly violates this chapter or a provision of City Charter Article III, Section 8 . . . commits a Class C misdemeanor"), has been rejected by the Supreme Court. *See Susan B. Anthony List*, 134 S. Ct. at 2344 (rejecting argument that because plaintiff had not stated an intent to make a knowing or reckless false statement, fear of enforcement of law prohibiting knowing or reckless false statements was misplaced). While *Susan B. Anthony List* did reject a similar argument, Zimmerman misses its broader point. There, relying on *Babbitt*, the Supreme

No. 16-51366

Court simply noted that a plaintiff does not have to "confess that he will in fact violate [a] law" in order to challenge its constitutionality. *Id.* at 2345; *see Babbitt*, 442 U.S. at 301 (holding that plaintiffs had standing to challenge law prohibiting use of "dishonest, untruthful and deceptive publicity" in consumer publicity campaigns despite absence of an intent on behalf of plaintiffs to "propagate untruths" where plaintiffs engaged in publicity campaigns in the past and stated intent to do so in the future and where "erroneous statement is inevitable in free debate" (quotation marks omitted)). Nothing in *Susan B. Anthony List*, as we read it, changes the core requirement that to bring a preenforcement challenge, a plaintiff must "produce evidence of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute," *Nat'l Fed'n of the Blind of Tex.*, 647 F.3d at 209, as well as a "credible threat of prosecution," *Babbitt*, 442 U.S. at 298; *accord Susan B. Anthony List*, 134 S. Ct. at 2343–44. Zimmerman has failed to establish such an intention, whether it involves a knowing violation or not.

## C.

Finally, Zimmerman contends that he has suffered an injury-in-fact due to the diversion of resources required to comply with the aggregate limit. However, there is no evidence that anyone in his campaign actually expended any additional time or money as a result of the aggregate limit. First, his campaign manager submitted a declaration stating that "it would take 42 hours of my time to verify [the] voter registration status" of all contributors. But he does not state that he ever actually spent that time verifying the status of all contributors. According to his declaration, the only time that he actually went through the steps necessary to verify voter-registration status was in order to verify the signatures on Zimmerman's ballot-access petition. Because he did not actually expend any additional resources in order to comply with the aggregate limit, Zimmerman's injury in this regard is hypothetical.

No. 16-51366

Second, Zimmerman contends that compliance with the aggregate limit has caused an injury because it takes time just to keep a "running tally" of contributions by zip code.  However, according to the trial testimony of a campaign consultant, maintaining a database of contributors by zip code appears to be a standard campaign practice.  Accordingly, the time spent maintaining a "tally" of contributions by zip code is insufficient to establish standing.  *See ACORN*, 178 F.3d at 359 (rejecting argument for injury based on resource expenditure where ACORN "failed to show that any of its purported injuries relating to monitoring costs were in any way caused by any action by [the defendant] that ACORN now claims is illegal, as opposed to part of the normal, day-to-day operations of the group").

## IV.

Austin challenges the district court's conclusion that the six-month temporal limit on fundraising is unconstitutional.  Finding that Austin had failed to present evidence "to show how a contribution made seven months before election day presents a different threat of *quid pro quo* corruption than a contribution made three months before election day," the district court concluded that Austin had failed to establish that the limit served the interest of preventing actual corruption or its appearance.  Once again, we agree with the district court.

As with dollar limits, temporal limits on contributions are subject to *Buckley*'s "closely-drawn" test.  *See Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 432 (5th Cir. 2014).  Accordingly, Austin must show (1) that the six-month limit serves the sufficiently important interest of preventing actual corruption or its appearance and (2) that it employs means that are closely drawn.  *See Buckley*, 424 U.S. at 25; *McCutcheon*, 134 S. Ct. at 1450.  As before, Austin must justify the limit with some evidence of actual corruption or its appearance.  *See Shrink Mo.*, 528 U.S. at 391–95.

Furthermore, following *McCutcheon*, an additional limit on contributions beyond a base contribution limit that is already in place must be justified by evidence that the additional limit serves a distinct interest in preventing corruption that is not already served by the base limit. *See* 134 S. Ct. at 1452 (addressing an aggregate limit on how much money any one donor may contribute in total to all candidates and stating that "if there is no risk that additional candidates will be corrupted by donations of up to $5,200"—the applicable base limit—"then the Government must defend the aggregate limits by demonstrating that they prevent circumvention of the base limits"); *Holmes v. FEC*, 875 F.3d 1153, 1161 (D.C. Cir. 2017) (stating that an "additional constraint 'layered on top' of the base limits" must "separately . . . serve the interest in preventing the appearance or actuality of corruption" (quoting *McCutcheon*, 134 S. Ct. at 1458)). That is to say, Austin needed to establish that even if a $350 contribution near the time of an election is not likely to lead to actual corruption or its appearance, the same contribution made at another time is. Furthermore, while the quantum of evidence needed is not clearly established, *see Shrink Mo.*, 528 U.S. at 393 (declining to further define the state's evidentiary obligation), what is needed to justify a temporal limit is additional to and distinct from what is needed to justify a dollar limit on contributions. *See id.* at 391 ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."). While *Buckley* and the long line of cases following it make clear that the dangers of large contributions "are neither novel nor implausible," *id.*, there is not the same well-trodden path regarding the dangers of contributions made far in time from an election.

The district court found that Austin failed to produce sufficient evidence to justify the temporal limit. The only evidence presented on the connection

between the timing of a contribution and corruption was the testimony of a former councilmember that "if we had money flowing through city hall . . . in a general way . . . it would really have a detriment [sic] to people's belief in council members making appropriate decisions," and the testimony of the city's expert witness, a political scientist with expertise in campaign finance, that, in his opinion, the temporal limit "directly alleviated concerns of the appearance of *quid pro quo* corruption" by "limit[ing] the period of time in which people could . . . reward candidates, particularly incumbent officeholders." He further noted that "before important votes, money flows in." However, as the district court noted, there was also testimony that the Austin City Council is in session and voting year round, such that the risk of money coming in before votes is no less of a concern in the six-month window before an election than at any other time. Accordingly, evidence suggesting a perception of corruption arising from contributions made shortly before votes does not establish a perception of corruption arising from contributions made many months before an election. If a contribution of $350 or less immediately before a vote during the six months before an election will not result in either actual corruption or its appearance, there is no evidence showing that the same contribution made before a vote 12 months before an election would. Accordingly, we agree with the district court that Austin failed to produce sufficient evidence to justify the temporal limit.

The cases Austin cites to support its position are not persuasive. First, *O'Toole v. O'Connor*, 802 F.3d 783 (6th Cir. 2015), considered a temporal limit on contributions to judicial campaign committees not politicians or political candidates. *Id.* at 787–88. "But a State's interest in preserving public confidence in the integrity of its judiciary extends beyond its interest in preventing the appearance of corruption in legislative and executive elections." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1667 (2015). Accordingly, *O'Toole*'s

No. 16-51366

reasoning is inapplicable here. Second, *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999), and *Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011), which upheld temporal limits on campaign contributions without any specific evidence that the timing of a contribution creates a risk of actual corruption or its appearance that is distinct from that created by the size of a contribution, *see Bartlett*, 168 F.3d at 715–16; *Thalheimer*, 645 F.3d at 1122, each predates *McCutcheon*, which, as explained above, requires such evidence. *See Holmes*, 875 F.3d at 1161 (stating that "additional constraint[s] 'layered on top'" of base limits must "separately . . . serve the interest in preventing the appearance or actuality of corruption" (quoting *McCutcheon*, 134 S. Ct. at 1458)).[4]

## V.

Austin next contends that the district court erred by holding that Zimmerman has standing to challenge the disgorgement provision and that that provision is unconstitutional. It argues that because Zimmerman was not required to disgorge the funds he had remaining after his campaign, but rather could retain them for purposes of making officeholder expenditures, he was not injured and that the provision is constitutional because it does not implicate any First Amendment rights. We disagree on both points and once again affirm the district court.

## A.

The disgorgement provision, § 8(F)(3) of the Austin City Charter, requires candidates to "distribute the balance of funds received from political contributions in excess of any remaining expenses for the election" to the

---

[4] Additionally, the Ninth Circuit in *Thalheimer* noted that its "own case law contain[ed] a vivid illustration of corruption in San Diego municipal government," notably "involving campaign contributions timed to coincide with the donors' particular business before the city council". 645 F.3d at 1123 n.3.

candidate's contributors, a charitable organization, or the Austin Fair Campaign Fund. Austin, Tex. Code, Art. III, § 8(F)(3). Candidates may, however, retain up to $20,000 "for the purposes of officeholder expenditures." *Id.* § 8(F)(6). Austin argues that because Zimmerman finished his 2014 campaign with only $1,200 remaining, he was not injured by the disgorgement provision because he could retain that full amount in an officeholder account. But that misses the nature of the First Amendment right at issue. Zimmerman has the right to use campaign funds to advocate for his own election. *See Buckley*, 424 U.S. at 52–53. That right was impaired by his inability to retain excess funds from the 2014 election for use in future campaigns. *See Shrink Mo. Gov't PAC v. Maupin*, 71 F.3d 1422, 1427–28 (8th Cir. 1995) (holding that a similar disgorgement provision burdens First Amendment rights by requiring candidates to use all campaign funds during the current campaign and prohibiting them from using those funds in future elections).

Austin also argues—for the first time in its reply brief—that Zimmerman lacks standing to challenge the disgorgement provision because he could, or perhaps should, have used his remaining funds to pay off his campaign debt.[5] Zimmerman ended his 2014 campaign with $18,000 in debt, all owed to himself, and $1,200 remaining in his campaign account after all other expenses had been paid. Austin argues that because Zimmerman chose to retain the remaining $1,200 in his officeholder account rather than use it to pay off his debt, his alleged injury was manufactured to create standing. An injury sufficient to confer standing "cannot be manufactured for the purpose of

---

[5] Ordinarily, we do not consider arguments raised for the first time in a reply brief. *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived."). However, because standing is a jurisdictional requirement, we consider these arguments. *See La. Landmarks Soc'y, Inc. v. City of New Orleans*, 85 F.3d 1119, 1122 n.3 (5th Cir. 1996) ("[S]tanding is jurisdictional and, therefore, non-waivable.").

litigation." *Barber v. Bryant*, 860 F.3d 345, 354 (5th Cir. 2017), *cert. denied*, 2018 WL 311355 (Jan. 8, 2018).  But here, there is evidence that Zimmerman had legitimate reasons for choosing to retain the funds in his officeholder account and did not do so simply to manufacture standing.  *Cf. id.* (stating that, in religious-display cases, personal confrontation with the offending display must "occur in the course of a plaintiff's regular activities; it cannot be manufactured for the purposes of litigation").  Zimmerman testified that he retained the $1,200 because he "wanted to have some money in the bank" for officeholder expenses.

Austin also argues—again for the first time in its reply brief—that Zimmerman "appears" to have treated his leftover funds inconsistently with a city ordinance in place at the time.  What was then § 2-2-43 of the City Code, titled "Existence of Campaign Debt," stated that

> [t]he existence and amount of a campaign debt relating to a prior campaign period shall be determined based on the actual outstanding obligations of the candidate or campaign committee as of the date of the election for which the debt is incurred, and *all funds held by the candidate or candidate's campaign committee in cash or bank accounts on that date shall be considered an offset to the campaign debt*.

On that basis, Austin argues that Zimmerman's remaining $1,200 should have been used to pay off his debt and that he therefore should not have had any remaining funds at all to which the disgorgement provision could apply.  We disagree with Austin's reading of the ordinance and, finding the ordinance unambiguous, do not defer to Austin's interpretation.  *See Voting for Am., Inc.*, 732 F.3d at 387 ("We defer to [a city's] interpretation of how the law is to be enforced, so long as it does not conflict with the statutory text." (quoting *Voting for Am., Inc.*, 488 F. App'x at 895)).  As the district court concluded, the ordinance applies to the calculation of campaign debt and does not require

candidates to use remaining funds to pay off debts.  It says only that remaining funds "shall be considered an offset," but says nothing requiring candidates to actually use remaining funds to pay off their debts.  Rather, candidates and officeholders with either remaining unpaid expenses or unreimbursed personal expenditures can continue to solicit and accept contributions after an election in order to pay off those expenses.  *See* Austin, Tex. Code, Art. III, § 8(F)(4)&(5).  Furthermore, the disgorgement provision by its terms requires only that funds "in excess of any remaining *expenses*" be distributed, *see id.* § 8(F)(3) (emphasis added), while subsections 4 and 5 refer separately to "unpaid expenses" and "unreimbursed campaign expenditures from personal funds."  The difference in drafting suggests that while remaining funds must be used to pay off expenses—that is, amounts owed to others—they are not required to be used to reimburse oneself for personal expenditures.  *See Silva-Trevino v. Holder*, 742 F.3d 197, 203–04 (5th Cir. 2014) (stating that courts are to give effect to legislatures' use of distinct terms).

**B.**

With respect to the constitutionality of the disgorgement provision, Austin argues only that there is no First Amendment right to use funds remaining after one campaign in a new and different campaign.  It contends that the First Amendment rights associated with campaign contributions exist only during the election cycle in which a contribution is given, and that the "First Amendment clock is re-set" if and when a new campaign begins.

We find that argument to be without force or support.  Austin again appears to overlook the nature of the right at issue.  While it is true that a donor's interest in voicing support for a particular candidate may end with the passing of one election cycle—for any number of reasons, the donor may no longer support that same candidate if and when the candidate runs again— that does not mean that all First Amendment rights associated with that

contribution so too must end.  When a contribution is made, it communicates the donor's support for a candidate.  But, once in the hands of the candidate, it then "helps the candidate communicate a political message."  *Shrink Mo.*, 528 U.S. at 400 (Breyer, J., concurring).  The candidate's expenditure of that money to engage in political speech is then afforded its own constitutional protection. *See Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 196 (1981) (plurality opinion) (describing contributions as "speech by proxy" and explaining how entities that receive contributions then use those contributions to "engage[] in independent political advocacy").  Accordingly, by prohibiting candidates from spending money raised in one election cycle on speech in the next, the disgorgement provision acts as an indirect burden on expenditures and thus implicates First Amendment rights.  *See Maupin*, 71 F.3d at 1427–28 (holding that disgorgement provision burdens First Amendment rights by, *inter alia*, prohibiting candidates from using funds in future elections); *see also Davis v. FEC*, 554 U.S. 724, 740 (2008) (striking down as unconstitutional an indirect burden on expenditures not justified by the interest in preventing corruption).

As a burden on expenditures, the disgorgement provision is subject to heightened scrutiny.  But, on appeal, Austin does not attempt to justify the provision as sufficiently tailored to serve its interest in preventing corruption. Accordingly, we affirm the district court's conclusion that the disgorgement provision is an unconstitutional abridgement of First Amendment rights.

## VI.

Finally, Austin argues that Zimmerman has waived his right to attorneys' fees under 42 U.S.C. § 1988(b) by not moving for fees in the district court.  But that issue is not properly before us now.  Precisely because Zimmerman did not move for fees below, and the district court has therefore not ruled on the issue, it is not properly presented for our review.  *See Luv N'*

No. 16-51366

*Care, Ltd. v. Groupo Rimar*, 844 F.3d 442, 451 n.8 (5th Cir. 2016) (declining to address issues raised by the parties but not decided by the district court).

For the foregoing reasons, we AFFIRM.